Slip Op. 13-132

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GPX INTERNATIONAL TIRE CORPORATION, and HEBEI STARBRIGHT TIRE CO., LTD.,** | |
| Plaintiffs, | |
| **TIANJIN UNITED TIRE & RUBBER INTERNATIONAL CO., LTD.,** | |
| Consolidated Plaintiff, | |
| v. | **Before: Jane A. Restani, Judge** |
| **UNITED STATES,** | **Consol. Court No. 08-00285** |
| Defendant, | Public Version |
| **BRIDGESTONE AMERICAS, INC., BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC, TITAN TIRE CORPORATION, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,** | |
| Defendant-Intervenors. | |

[Commerce's redetermination in countervailing duty case is sustained.]

## <u>OPINION</u>

Dated: October 30, 2013

William H. Barringer, Daniel L. Porter, James P. Durling, Matthew P. McCullough, and Ross E. Bidlingmaier, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for the Plaintiffs GPX International Tire Corporation and Hebei Starbright Tire Co., Ltd.

Mark B. Lehnardt, Lehnardt & Lehnardt, LLC, of Liberty, MO, argued for Consolidated Plaintiff Tianjin United Tire & Rubber International Co., Ltd.

Alexander V. Sverdlov, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for the Defendant.  With him on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Loren M. Preheim, Trial Attorney, and John J. Todor, Trial Attorney.  Of counsel on the brief were Daniel J. Calhoun and Matthew D. Walden, Attorneys, U.S. Department of Commerce, of Washington, DC.

Elizabeth J. Drake, Stewart and Stewart, of Washington, DC, argued for the Defendant-Intervenors Titan Tire Corporation and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC.   With her on the brief were Terence P. Stewart, Geert M. De Prest, William A. Fennel, Eric P. Salonen, and Wesley K. Caine.

Joseph W. Dorn, J. Michael Taylor, Daniel L. Schneiderman, Jeffrey M. Telep, Kevin M. Dinan, Prentiss L. Smith, and Christopher T. Cloutier, King & Spalding, LLP, of Washington, DC, for Defendant-Intervenors Bridgestone Americas Tire Operations, LLC and Bridgestone Americas, Inc.

Restani, Judge: This matter is before the court following a remand to the

Department of Commerce ("Commerce") in GPX Int'l Tire Corp. v. United States, 893 F. Supp.

2d 1296 (CIT 2013) ("GPX VII").  Plaintiffs GPX International Tire Corporation ("GPX") and

Hebei Starbright Tire Co., Ltd. ("Starbright"),[1] Consolidated Plaintiff Tianjin United Tire &

Rubber International Co., Ltd. ("TUTRIC"),  and Defendant-Intervenors Titan Tire Corporation

and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy Allied Industrial and

Service Workers International Union, AFL-CIO-CLC (collectively, "Titan") challenge various

aspects of the Final Results of Redetermination Pursuant to Remand, ECF No. 394 ("Remand

Results").  For the reasons set forth below, Commerce's Remand Results are sustained.

## BACKGROUND

The court assumes familiarity with the facts of this case as set out in the previous

---

[1] Starbright is a fully owned subsidiary of GPX.  Resp't Pl.'s App. - Confidential, Tab 12, Ex. B at 2.  At times throughout this opinion, the names of the two companies are used interchangeably where a distinction is unimportant.

opinions.  See generally GPX VII, 893 F. Supp. 2d at 1318–34.  For ease of understanding,

however, a brief summary is provided below.

           This case involves challenges to Commerce's final determination in a

countervailing duty ("CVD") investigation of certain pneumatic off-the-road tires from the

People's Republic of China ("PRC").  See Certain New Pneumatic Off-the-Road Tires from the

People's Republic of China: Final Affirmative Countervailing Duty Determination and Final

Negative Determination of Critical Circumstances, 73 Fed. Reg. 40,480 (Dep't Commerce July

15, 2008); see also Issues and Decision Memorandum for the Final Affirmative Countervailing

Duty Determination: Certain New Pneumatic Off-the-Road Tires (OTR Tires) from the People's

Republic of China, C-570-913, POI: 1/01/06–12/30/06 (July 7, 2008), available at

http://ia.ita.doc.gov/frn/summary/prc/E8–16154–1.pdf (last visited Oct. 21, 2013) ("I & D

Memo").  In its previous order, the court instructed Commerce to address five issues raised in the

initial rounds of briefing in this matter.  See GPX VII, 893 F. Supp. 2d at 1319–33.  Specifically,

the court ordered Commerce to: 1) re-weigh the evidence related to the arm's-length nature of the

Hebei Tire Co., Ltd. ("Hebei Tire") asset sale; 2) examine the veracity of appraisals proffered by

GPX in determining whether Hebei Tire's assets were sold for fair market value ("FMV");

3) explain its inability to offset any subsidy determined to have been transferred to Starbright by

any amount of the purchase price that reflected payment for the subsidy; 4) explain its loan

benefit calculation and whether Titan's alternative methodology constitutes a legitimate attempt

to avoid a distorted calculation; and 5) consider evidence concerning the transfer of TUTRIC

debt holdings and reduce TUTRIC's benefit calculation by the amount of any payment made by

or on behalf of TUTRIC.  See id.  On remand, Commerce: 1) determined that the sale of Hebei

Tire's assets was not conducted at arm's length; 2) determined that the appraisals proffered by

GPX are unsatisfactory for benchmarking purposes; 3) explained its inability to calculate a

purchase price offset; 4) explained its loan benefit calculation and why it rejected Titan's

alternative; and 5) considered TUTRIC's evidence, continued to find that TUTRIC benefited

from countervailable debt forgiveness, and reduced TUTRIC's benefit calculation as ordered.

See Remand Results at 1–2.[2]

       GPX continues to challenge Commerce's findings concerning the nature of the

Hebei Tire asset sale.  Resp't Pl.'s Cmts. on the U.S. Dep't of Commerce's Remand

Redetermination, ECF No. 397 ("GPX Cmts.") 1–9.[3]  Titan argues that Commerce's loan benefit

calculations are unlawful and unsupported by substantial evidence.  Cmts. of the Titan Tire Corp.

and the United Steelworkers Union on the Dep't of Commerce's Redetermination Pursuant to

Remand, ECF No. 398 ("Titan Cmts.") 2–7.  Although TUTRIC's rate of countervailing duties

was reduced on remand from 6.85% to 3.93% because the allegedly forgiven debt was partially

repaid, TUTRIC argues that Commerce failed to reasonably consider the evidence concerning its

---

[2] Commerce indicated that its redetermination was completed under protest, but it failed to specify which aspects of the Remand Results the protest covered.  The only legitimate purpose of registering a protest in a remand determination is to preserve a particular issue for appeal where the agency has been compelled to take a particular step that results in an outcome not of its choosing.  At oral argument, government counsel conceded that the final TUTRIC determination is the only one that may be so described, i.e. the agency was compelled to consider new determinative facts in valuing the subsidy to TUTRIC.  Whether the general expression of disagreement is sufficient to preserve this specific issue for appellate review cannot be decided here.  Putting aside appearance issues, specificity would eliminate ambiguity for these purposes.

[3] Although GPX's rate has been reset by an intervening administrative review, see New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Countervailing Duty Administrative Review, 76 Fed. Reg. 23,286, 23,288 (Dep't Commerce Apr. 26, 2011), this case is relevant to whether countervailing duties are owed at all.

debt financing and that Commerce's determination is contrary to law.  Cmts. on Remand

Redetermination of Tianjin United Tire and Rubber Int'l Co., Ltd., ECF No. 400 ("TUTRIC

Cmts.") 10–19.  Defendant United States responds that Commerce's determinations are

supported by substantial evidence and in accordance with law.  Def.'s Resp. to Cmts. on the

Final Redetermination Pursuant to Ct. Remand, ECF No. 412 ("Def. Cmts.") 10–31.[4]

## JURISDICTION AND STANDARD OF REVIEW

The court has continuing jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court

will not uphold any determination by Commerce that is "unsupported by substantial evidence on

the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).

## DISCUSSION

**I.      Change in Ownership of Hebei Tire**

GPX challenges Commerce's determination on remand that Starbright received

countervailable subsidies when it acquired Hebei Tire's assets in 2006.  GPX Cmts. 1–9.

Defendant argues that Commerce's determination is supported by substantial evidence and in

accordance with law.  Def. Cmts. 10–23.

To find a countervailable subsidy, Commerce is required by statute to identify a

financial contribution given by an authority that conferred a benefit on an entity.  19 U.S.C.

§ 1677(5)(B).  "A change in ownership of all or part of a foreign enterprise or the productive

assets of a foreign enterprise does not by itself require a determination by the administering

authority that a past countervailable subsidy received by the enterprise no longer continues to be

---

[4] Antidumping duty issues were resolved previously.  See generally GPX Int'l Tire Corp. v. United States, 715 F. Supp. 2d 1337 (CIT 2010).

countervailable, even if the change in ownership is accomplished through an arm's length transaction." Id. § 1677(5)(F).  The statute, however, does not explain under what conditions a subsidy will be extinguished upon the sale of the subsidized company.  As the court discussed in its previous opinion, Commerce has promulgated a series of regulations attempting to establish a reasonable methodology for determining whether a purchaser continues to benefit from a countervailable subsidy given to its predecessor.  See GPX VII, 893 F. Supp. 2d at 1321–24.

Under its current practice, Commerce begins with a baseline presumption that non-recurring subsidies continue to benefit the recipient for the average useful life of the recipient's assets.  Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act, 68 Fed. Reg. 37,125, 37,127 (Dep't Commerce June 23, 2003) ("Final Modification").  Where a transaction is at arm's length and for fair market value, Commerce will consider the subsidy extinguished.  See id.  Commerce first examines whether the transaction was conducted at arm's length.  Id. at 37,127.  In so doing, Commerce looks for a relationship between the parties and whether the seller sought to pursue public interests.  Id. at 37,127, 37,130, 37,132–33.  Commerce also examines whether the purchaser paid FMV.  Id. at 37,127.  Under this prong, however, Commerce does not focus on comparing a numerical estimate of FMV to the purchase price.  Id. at 37,131.  Instead, Commerce employs a process-based approach that looks to whether the parties relied on independent evaluations before or during negotiations to establish a price, whether the sale was sufficiently open to allow for competitive bidding, whether the sale was awarded to the highest bidder, and whether there were

requirements for future investment.[5]  Id. at 37,127.  Again, under Commerce's methodology,

both findings are necessary conditions to Commerce finding that the subsidies were extinguished.

Id. at 37,127–28.

In its previous decision, the court sustained Commerce's initial determination that

---

[5] According to the methodology:

A primary consideration in this regard normally will be whether the government failed to maximize its return on what it sold, indicating that the purchaser paid less for the company or assets than it otherwise would have had the government acted in a manner consistent with the normal sales practices of private, commercial sellers in that country.

Final Modification, 68 Fed. Reg. at 37,127.

To determine whether this condition is satisfied, Commerce has identified a non-exhaustive list of four considerations:

(1) Objective analysis: Did the government perform or obtain an objective analysis in determining the appropriate sales price? Did it implement the recommendations of such objective analysis for maximizing its return on the sale, including in regard to the sales price recommended in the analysis?

(2) Artificial barriers to entry: For example, did the government impose restrictions on foreign purchasers or purchasers from other industries, or overly burdensome or unreasonable bidder qualification requirements, or any other restrictions that artificially suppressed the demand for, or the purchase price of, the company?

(3) Highest bid: For example, was the highest bid accepted and was the price paid in cash or close equivalent? Why or why not?

(4) Committed investment: For example, were there price discounts or other inducements in exchange for promises of additional future investment that private commercial sellers would not normally seek (e.g., retaining redundant workers or unwanted capacity)? Did the committed investment requirements serve as a barrier to entry, or in any way distort the value that bidders were willing to pay for what was being sold?

Id.

Hebei Tire was not fully privatized at the time of the sale at issue, and therefore Commerce need

not presume that the sale was at arm's length and for FMV.  GPX VII, 893 F. Supp. 2d at 1325.

The court concluded, however, that Commerce's arm's-length and FMV analyses required

revisiting.  Id. at 1327–28.  With respect to the arm's-length analysis, the court held that although

Commerce had reasonably determined that a worker retention agreement and shareholder-

employee side payment attached to the sale could have undermined the arm's length nature of the

transaction, Commerce had adopted a distorted view of the actions of Hebei Tire's chairman in

communicating a pre-negotiated purchase price to the auction house that administered the sale.

See id. at 1325–26.  As Commerce's determination that the sale was not conducted at arm's

length rested on its analysis of both the worker retention agreement/payment and the chairman's

actions, the court instructed Commerce to re-weigh the evidence.  Id. at 1326.  With respect to

the FMV analysis, the court held that although Commerce is entitled to deference in determining

what weight to assign the various components in its process-based methodology, Commerce

cannot completely disregard company appraisals on the record.  Id. at 1327.  As Commerce had

done so with respect to appraisals proffered by GPX, the court instructed Commerce to examine

the veracity of these appraisals.  Id.  In view of Commerce's analysis of these issues, the court

sustains Commerce's determination on remand.

     A.     Arm's-Length Analysis

         GPX first argues that Commerce's determination as to the arm's-length nature of

the sale is inconsistent with the court's instruction and unsupported by substantial evidence.

GPX Cmts. 1–6.  On remand, Commerce determined that the Hebei Tire chairman's actions were

inconsistent with the transaction having been conducted at arm's length and that the worker

retention agreement/payment independently defeated the arm's-length nature of the transaction. Remand Results 7–10, 37–38.  The latter determination is supported by substantial evidence.

As an initial matter, the court finds that Commerce has maintained a distorted view of the chairman's interaction with the auction house.  In its previous decision, the court found that Commerce had "failed to point to evidence that in setting the reserve price, according to the mandatory auction rules, the chairman somehow acted contrary to Hebei Tire's interest in securing a winning bid, from any buyer, in light of its ongoing foreclosure proceedings." GPX VII, 893 F. Supp. 2d at 1326.  Critically, the court noted that the chairman's actions appeared "consistent with Hebei Tire ensuring that a bid would be made, as well as be accepted, during the auction, as a previous auction had failed to solicit any winning bids." Id.  Nevertheless, Commerce determined on remand that the chairman need not have acted contrary to Hebei Tire's interests for Commerce to find that his actions were inconsistent with the transaction having been conducted at arm's length.  Remand Results at 9.  Instead, Commerce determined that its finding was reasonable because the purchase price "embodied the conjoined interests of both buyer and seller." Id.  This position is without merit.

Although an "arm's length transaction" is not defined by statute, the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA") defines it for purposes of 19 U.S.C. § 1677(5)(F) as "a transaction negotiated between unrelated parties, each acting in its own interest, or between related parties such that the terms of the transaction are those that would exist if the transaction had been negotiated between unrelated parties."  H.R. Doc. 103-316 (1994), at 928, reprinted in 1994 U.S.C.C.A.N. 4040, at 4241 ("SAA").  The issue, therefore, is whether Hebei Tire's chairman failed to act in his company's interest, not whether

the purchase price reflected the interests of both Starbright and Hebei Tire.[6]  Moreover, it seems

perfectly self-interested that the chairman, having been unsuccessful once before, would take

proactive measures to ensure that the auction house's procedures not stand in the way of the only

sale in sight.  All the chairman advocated for was a lower price floor, not a price ceiling.

Commerce cannot determine reasonably that such efforts to ensure closure of the deal defeat the

arm's-length nature of a transaction.  See Yangzhou Bestpak Gifts & Crafts Co. v. United States,

716 F.3d 1370, 1378 (Fed. Cir. 2013) ("[W]hile various methodologies are permitted by the

statute, it is possible for the application of a particular methodology to be unreasonable in a given

case.  Form should be disregarded for substance and the emphasis should be on economic

reality." (internal quotation marks, citations, and brackets omitted)).

      Despite this error, however, Commerce determined in the alternative that the

arm's length nature of the sale was independently defeated by the worker retention agreement,

combined with the side payment to the shareholder-employees.[7]  Remand Results at 37–38.  The

---

[6] Defendant also argues that the chairman's actions were inconsistent with the definition of "arm's length transaction" provided in the Final Modification.  Def. Cmts. 12.  Defendant characterizes the Final Modification as defining an arm's-length transaction as "a transaction where the buyer and seller, as well as their interests, are separate."  Id.  The Final Modification says no such thing; rather, the Final Modification provides only that Commere "will be guided by the SAA's definition of an arm's-length transaction."  Final Modification, 68 Fed. Reg. at 37,127.  There is no reason to believe an arm's-length transaction can never occur where interests overlap in part, such as an interest in finalizing an agreed-upon transaction.

[7] Commerce repeated its analysis of the worker retention agreement on remand.  Remand Results at 7–8.  Although GPX seems to acknowledge that the court held Commerce's treatment of the worker retention agreement to be reasonable in its previous opinion, GPX again argues that Commerce did not reasonably consider this agreement, perhaps under the view that Commerce altered its prior analysis on remand.  See GPX Cmts. 2–4.  Defendant rightly asserts that Commerce merely elaborated on the significance of the agreement, as per the court's instruction to re-weigh the evidence.  Def. Cmts. 14.  The court declines to revisit this issue.

court found in its previous opinion that Commerce could conclude reasonably that this agreement

created a conflict between the interests of profit maximization and job security such that Hebei

Tire may have been less likely to negotiate for the highest possible price than it otherwise would

have.  GPX VII, 893 F. Supp. 2d at 1326.   With the benefit of this analysis and Commerce's new

determination that this was an independent basis for finding that the transaction was not at arm's

length, the court sustains Commerce's determination that the sale was not conducted at arm's

length.

      B.     FMV Analysis

      GPX also challenges Commerce's FMV analysis.  GPX Cmts. 6–8.  GPX argues

that Commerce failed to reasonably consider the appraisals on the record and that Commerce's

FMV determination is unsupported by substantial evidence.  Id.  Commerce contends at the

outset that because the transaction must be both at arm's length and for FMV, it is unnecessary to

consider one prong if the court finds that the other has not been met.  See Remand Results at 10.

Nonetheless, Commerce determined on remand that the appraisals proffered by GPX, one

commissioned by Starbright and another commissioned by Hebei Tire, are unsatisfactory for

benchmarking FMV.  Id. at 14–18.  As to the Starbright-commissioned appraisal, Commerce

supported its determination with statements in the appraisal attesting to its incomplete and

cursory coverage, as well as with evidence that Hebei Tire's records were poorly managed.[8]  Id.

---

    [8] Specifically, Commerce found: that the appraisal states that its coverage is partial; that
the appraisal states as its objective to provide only "a general idea" of the assets' value; that the
appraisal states that off-the-books equipment is excluded from the valuation; that the appraisal
may not have included certain mortgaged equipment; that beyond land use rights, the appraisal
includes no intangible property; and that the appraisal's accuracy turns on the quality of Hebei
Tire's records, which an outside due diligence report on the record found deficient.  Remand
                                                             (continued...)

at 15–17.  As to the Hebei Tire-commissioned appraisal, Commerce supported its determination

with evidence concerning the timing and duration of the appraisal, the scope of the appraisal, and

the appraisers' levels of experience, as well as with statements in the appraisal conditioning its

veracity on the quality of Hebei Tire's records.  Id. at 17–18.  GPX contends that Commerce's

determination relies on unreasonable inferences from the evidence.  See GPX Cmts. 6–7.  This

claim is without merit.

        The court turns first to Commerce's assertion that the FMV analysis is rendered

unnecessary by a finding by Commerce that the transaction was not at arm's length or vice versa.

Commerce's position is based on its present methodology that requires both conditions be met.

See Final Modification, 68 Fed. Reg. at 37,127, 37,130.  In adopting its process-based

methodology, Commerce explained that it focuses on the arm's-length nature of the sale as a

means for determining whether FMV was paid: if the transaction was at arm's length, Commerce

presumes FMV was paid.  See id.  Although this presumption is a reasonable interpretation of the

statute, Commerce is precluded from adopting a per se rule that the absence of an arm's-length

transaction always prevents subsidies from being extinguished, regardless of whether FMV is

actually paid, absent some finding of a sham transaction.  Such a position lacks support in the

statute, which merely indicates that an arm's length transaction does not necessarily extinguish a

subsidy, such as absent the payment of FMV for the company.  See 19 U.S.C. § 1677(5)(F).  The

SAA clarifies that Commerce must exercise its discretion in examining the sale of a subsidized

company "carefully through its consideration of the facts of each case and its determination of

---

        [8](...continued)
Results at 15–17.

the appropriate methodology to be applied." <u>SAA</u> at 928.  The case law of the Court of Appeals

for the Federal Circuit also places the emphasis in this analysis on the question of whether FMV

was paid for the acquired assets, because if so, no benefit continues to accrue to the buyer.  <u>See</u>

<u>Allegheny Ludlum Corp. v. United States</u>, 367 F.3d 1339, 1346 (Fed. Cir. 2004) ("<u>Allegheny I</u>")

(rejecting a previous methodology that did not consider directly "the economic indicators of the

repayment of a past subsidy"); <u>Allegheny Ludlum Corp. v. United States</u>, 29 CIT 157, 162, 358

F. Supp. 2d 1334, 1339 (2005) ("<u>Allegheny II</u>") ("Therefore, the payment of fair market value

means that the <u>purchasing firm</u> did not receive more than it paid for (assuming the government

did not distort the market in a manner affecting the sale.)").  Previous methodologies adopting

per se rules have been rejected as chronicled in the court's previous opinion.  Commerce must

analyze all relevant information in this fact-intensive analysis.

      Although the court in <u>GPX VII</u> recognized that Commerce's change-in-

ownership methodology is a reasonable method of establishing presumptions for the

extinguishment or non-extinguishment of subsidies based on a process-based approach, it also

held that where there is probative, direct evidence on the record rebutting a presumption that

FMV was not paid, Commerce cannot ignore relevant evidence by adopting a methodology that

refuses to consider it.  The essence of the inquiry is whether FMV was paid, thereby

extinguishing the subsidies.  Commerce may select from a variety of reasonable methodologies,

including imperfect ones based on reasonable presumptions, but it may not foreclose an avenue

of relevant inquiry in doing so or disregard relevant evidence.  Commerce's repeated references

to certain evidence, such as bottom-line objective analyses, not being dispositive misses the

point.  Commerce must consider all probative evidence, whether it finds it independently

dispositive or not.  Accordingly, where as here, Commerce is presented with allegedly direct, objective evidence of FMV,[9] it must analyze that evidence and support by substantial evidence any determination with respect to that evidence.[10]

Turning to the appraisals at issue in this case, GPX first asserts, without setting out any substantive arguments, that the Starbright-commissioned appraisal demonstrates that Hebei Tire's assets were sold for FMV.  GPX Cmts. 6.  This claim plainly fails in the light of the various indications that the appraisal was cursory and its coverage partial.  "[W]hen a valuation study, or valuation studies, have not considered all the facts and circumstances, reliance thereon is misplaced."  Allegheny II, 29 CIT at 169, 358 F. Supp. 2d at 1345.

As to the Hebei Tire-commissioned appraisal, GPX first disputes Commerce's finding that due to the timing and duration of the appraisal, it was likely a results-oriented document commissioned to comply with regulatory requirements.  GPX Cmts. 6–7.  GPX argues that Commerce failed to explain why the timing and duration of the appraisal necessarily leads to the conclusion that its analysis was cursory.  Id.  Commerce is required, however, only to arrive reasonably at its conclusions, and the circumstances of the appraisal readily support Commerce's

---

[9] Throughout its analysis, Commerce emphasizes that it does not calculate a numerical FMV within its process-based approach.  Commerce seems to go further by treating its process-based methodology as an end unto itself.  At bottom, however, FMV is by definition a value, either a fixed number or a range of numbers.  Although FMV may be amorphous and difficult for Commerce to calculate, this fundamental concept cannot be ignored by Commerce when it determines that an objective analysis calculating FMV is not probative.

[10] The court notes that this does not mean Commerce must base its determinations in change-in-ownership situations on objective evidence of the numerical value of FMV, and in fact, given the problems likely to arise in many appraisals, as here, Commerce's ultimate determination often may be to reject the appraisals as faulty and base its decision instead on its process-based analysis.

finding.[11]  GPX additionally argues that Commerce failed to reasonably consider the fact that the

appraisal is actually three different appraisals, i.e. not an in toto valuation.  Id. at 7.  Commerce

explained, however, that the separate appraisals fail to account for certain intangible sources of

value, such as goodwill and intellectual property.  Remand Results at 41 n.33.

        GPX also contests Commerce's finding that the appraisers likely lacked adequate

experience for valuing the assets of a tire company.  GPX Cmts. 7.  Commerce's finding was

based on the response of a Hebei Tire official during verification that "there was only one tire

manufacturer in Xingtai" when asked whether the appraiser had experience in valuing tire

equipment.  Remand Results at 18.  GPX argues that the statement of the Hebei Tire official does

not imply that the appraiser lacked adequate experience.  GPX Cmts. 7.  The court is satisfied,

however, that Commerce's skepticism is supported by the evidence, even if Commerce's

determination is not the only reasonable conclusion supported by the record.

        Finally, GPX argues that Commerce's position assumes, and requires, that Hebei

Tire lied to or withheld information from the appraisers.  GPX Cmts. 7.  This claim is without

merit.  Commerce was instructed to examine the veracity of the appraisals, and record evidence

demonstrates that Hebei Tire's records were managed poorly and therefore unlikely to have

provided the appraisers with the information necessary for a full and accurate appraisal.  See

Remand Results at 16, 18 (citing Starbright's April 8, 2008 questionnaire response at Exhibit V-

CVD-1 (due diligence report)).  Commerce has noted that appraisals of companies are inherently

---

        [11] Specifically, the appraiser valued [[          ]] pieces or sets of equipment in [[          ]],
and also may have valued [[                                        ]].  Remand Results at 17–18.

                                                                    *Confidential Information Deleted*

difficult and rely on numerous, often subjective, factors.  Here, Commerce pointed to a slew of

problems with the appraisals on the record.  Accordingly, Commerce's determination that the

appraisals are not valuable in determining FMV is supported by substantial evidence.  Because

Commerce considered and reasonably rejected evidence undermining its presumption that FMV

was not paid in this non-arm's-length transaction, Commerce's remand determination is

supported by substantial evidence and is in accordance with law.

     C. Purchase Price Offset

     GPX finally argues that Commerce failed to provide a credible explanation for its

inability to offset the amount of subsidy transferred to Starbright by the amount of the purchase

price that reflected payment for the subsidy.  GPX Cmts. 8–9.  Commerce determined on remand

that the use of a purchase price offset would be inappropriate.  Remand Results at 24–25.

Commerce also determined that such a calculation is not practicable without satisfactory

appraisals and explained how this calculation differs from those involving the determination of

benefits pursuant to 19 U.S.C. § 1677(5)(E).  Id. at 25–28.  Defendant argues that Commerce's

explanation is consistent with the court's instructions and should be sustained.  Def. Cmts.

20–23.

     As an initial matter, the court rejects Commerce's assertion that a purchase price

offset would be inappropriate under the statute.  Remand Results at 24–25.  Commerce decided

on remand that such an offset is unnecessary because Commerce already conducted a

countervailing duty analysis of Hebei Tire, and it merely continued to allocate existing subsidies

over the average useful life of the assets.  Id.  Essentially, Commerce takes the position that a

subsidy is either extinguished in its entirety via the payment of FMV in a change in ownership

transaction or it continues in full force, without any possible abatement based on the purchase

price.  This argument, however, runs contrary to the previous holdings of the court and cannot be

credited.  See Acciani Speciali Terni S.p.A. v. United States, 28 CIT 2013, 2026, 350 F. Supp. 2d

1254, 1265–67 (2004) ("Commerce should examine the totality of the economic circumstances

to determine whether the pre-privatization subsidy carries over to the post-privatization entity."

(emphasis added)) (citing Allegheny I, 367 F.3d at 1347–48); see also Allegheny II, 29 CIT at

162, 358 F. Supp. 2d at 1339 ("The fair market value of the company takes into account all of a

company's liabilities and assets including assets that were incurred with government support.

Therefore, the payment of fair market value means that the purchasing firm did not receive more

than it paid for (assuming the government did not distort the market in a manner affecting the

sale.)").

       Commerce reasonably found in this case, however, that no reliable evidence

quantifying repayment of the subsidies exists on the record.  As the court discussed supra in the

context of Commerce's FMV analysis, Commerce reasonably determined that the appraisals on

the record are unsatisfactory for calculating FMV.  Determining the extent to which Hebei Tire's

purchase price reflected payment for Hebei Tire's subsidies, therefore, would require that

Commerce calculate the precise numerical value of FMV of Hebei Tire.  Remand Results at

25–28.  This calculation, in turn, would require Commerce to value a large number of specialized

machines, buildings, and intangible assets, an inquiry not contemplated under its process-based

methodology.[12]  Id.  The court is persuaded that in the present matter Commerce possesses

neither the expertise nor the resources to undertake such an endeavor where no credible record

evidence exists.  Indeed, Commerce's process-based methodology was upheld in part on these

grounds.  See GPX VII, 893 F. Supp. 2d at 1327.  The court notes, however, that this is not to say

that Commerce could refuse to consider evidence placed on the record demonstrating that full or

nearly-full FMV was paid, thereby compensating the seller for any subsidy benefit that would

otherwise be received and rebutting Commerce's presumption of non-extinguishment.

              GPX also argues that Commerce's explanation is inconsistent with its practices

elsewhere, including its dismissal of the appraisals proffered by GPX in this matter and its ability

to value difficult assets like land in its investigations.  GPX Cmts. 8–9.  These arguments are

without merit.  First, Commerce determined in the present matter that GPX's appraisals were

unsatisfactory on the basis of qualitative, process-based considerations.  See Remand Results at

15–18.  Commerce did not evaluate the veracity of each individual valuation in the appraisals or

undertake its own competing appraisal.  Id.  Second, where Commerce has benchmarked land in

the past, it has done so by reference to either available benchmark figures placed on the record or

a process-based methodology.  See, e.g., Final Affirmative Countervailing Duty Determination:

Steel Wire Rod from Germany, 62 Fed. Reg. 54,990, 54,994 (Dep't Commerce Oct. 22, 1997);

Laminated Woven Sacks from the People's Republic of China: Preliminary Affirmative

---

[12] Commerce noted on remand that the appraisals indicate that the Hebei Tire facility contained [[          ]] pieces of equipment.  Remand Results at 25 n.17.  Commerce also noted on remand that the facility comprised [[      ]] buildings.  Remand Results at 26 n.18.  GPX contests neither assertion.  See GPX Cmts. 8–9.

*Confidential Information Deleted*

Countervailing Duty Determination; Preliminary Affirmative Determination of Critical

Circumstances, In Part; and Alignment of Final Countervailing Duty Determination with Final

Antidumping Duty Determination, 72 Fed. Reg. 67,893, 67,909 (Dep't Commerce Dec. 3, 2007).

Readily accessible benchmark figures are not available on this record for the specialized

machines and buildings that would have to be valued for Commerce to determine the FMV of a

large tire factory or even figures for comparable companies.  Remand Results at 25–27.  The

court declines to impose such a burden on Commerce to develop the record with this information

when the statute does not require it.  Accordingly, Commerce's decision, on this record, not to

offset the subsidy benefit allocated to Starbright is supported by substantial evidence and is in

accordance with law.

**III.    Titan's Loan Benefit Calculation Challenge**

Titan argues that Commerce failed to explain adequately on remand why an

inflation-based adjustment is a suitably proxy for a currency expectation adjustment to a loan

interest rate benchmark in the context of the Chinese economy and why the omission of this

adjustment would not avoid a distorted benefit calculation.  Titan Cmts. 3–7.  Defendant argues

that Commerce complied with the court's instruction and that its determination is supported by

substantial evidence.  Def. Cmts. 28–31. With the benefit of Commerce's explanation on

remand, the court will sustain the determination.

In its previous opinion, the court instructed Commerce to "explain why it uses a

currency expectation adjustment for comparing domestic interest rates, why an inflation

adjustment is a suitable proxy for a currency expectation adjustment, and whether the proposed

adjustment by [Titan] is essentially an attempt to countervail against China's distorted inflation

rate or a legitimate attempt to avoid a distorted benefit calculation." GPX VII, 893 F. Supp. 2d at

1330–31.  In its initial investigation, Commerce found that the companies under investigation

had not received any comparable market-based loans in the past and that no comparable

commercial benchmark rates existed within the PRC due to market distortions.  I & D Memo at

104–05.  Accordingly, Commerce calculated a benchmark rate based on a basket of interest rates

from a variety of developmentally similar countries.  Id. at 109–10.  Typically, Commerce

applies a currency expectation adjustment to interest rates calculated for loans to account for the

portion of the rate attributable to expected exchange rate fluctuations.  Id.  As robust forward

exchange rate data were unavailable for the set of developmentally similar countries, however,

Commerce instead used an inflation rate adjustment as a proxy for the exchange rate adjustment.

Id. at 110.

         The statute provides that a benefit received from a subsidized loan is equal to the

"difference between the amount the recipient of the loan pays on the loan and the amount the

recipient would pay on a comparable commercial loan that the recipient could actually obtain on

the market."  19 U.S.C. § 1677(5)(E)(ii).  In calculating this difference, Commerce looks to

comparable loans based on similar structural features including interest calculation, currency, and

maturity.  19 C.F.R. § 351.505(a)(2).  Where the examined firm does not have any comparable

past loans, Commerce normally will examine the national average interest rate for comparable

commercial loans, when such a market exits.  Id. § 351.505(a)(3)(ii).  When this does not exist

on a commercial basis, Commerce looks to interest rates in other comparable markets.  See id.

§ 351.505(a)(2)(ii).  "In making the comparison . . . , the Secretary normally will rely on effective

interest rates."  Id. § 351.505(a)(1).

As a preliminary matter, the court notes that Commerce explained on remand why it uses a currency expectation adjustment to compare cross-country domestic interest rates. Remand Results at 33–34. In short, Commerce has determined that reaching an apples-to-apples cross-country comparison of borrowing costs requires, where available, the use of forward exchange rates to adjust for the extent to which expectations about future movement in currency markets are priced into interest rates, even for domestic loans. Remand Results at 33–34; Def. Cmts. 29. This explanation has not been challenged and is consistent with the regulations.

Defendant's argument, not clearly delineated in the Remand Results, is that Commerce used an inflation adjustment here both as a proxy for a currency adjustment as well as an independent method of obtaining an apples-to-apples comparison. Titan first challenges Commerce's determination that an inflation-based adjustment is a reasonable proxy for exchange rate expectations in the context of the Chinese economy. Titan Cmts. 3–6. Commerce explained on remand the basic proposition that inflation represents a loss in purchasing power and, all else equal, the devaluation of a currency relative to others. Remand Results at 34. Titan argues that although Commerce determined that its methodology should adjust for inflation to the extent that Chinese lenders and borrowers rely on inflation when setting the price of credit, Commerce made no factual determination that this proposition holds in the case of the PRC and ignores record evidence to the contrary. Titan Cmts. 3–6 (citing Remand Results at 35–36). The statement relied upon by Titan deals with Commerce's preference for an adjustment based on the consumer price index ("CPI") versus a gross domestic product ("GDP") deflator and does not represent a Commerce policy of using an inflation adjustment only when there is a perfect correlation between interest rates and inflation rates. See Remand Results at 35–36. The court holds that

Titan's evidence fails to undermine Commerce's reliance on the relationship between inflation

and interests rates in its calculation and that Commerce's determination is supported by

substantial evidence.

        Commerce cites textbook authority providing empirical support for the positive

correlation between inflation and exchange rates.  Remand Results at 35 (citing Stephen G.

Kellison, The Theory of Interest 299 (2d ed. 1991) ("[D]espite the difficulty of precisely

measuring [inflation] expectations, the evidence clearly indicates that the relationship [between

expected rates of inflation and interest rates] does exist.")).  Titan notes in response that

Commerce previously found that interest rates in the PRC are set subject to Government of

China ("GOC")-imposed deposit rate ceilings and lending rate floors, not on the basis of

unencumbered market forces such as inflation.  Titan Cmts. 4 (citing Issues and Decision

Memorandum for the Final Determination in the Countervailing Duty Investigation of Coated

Free Sheet from the People's Republic of China, C-570-907 (Oct. 17, 2007) at 68, available at

http://ia.ita.doc.gov/frn/summary/prc/E7-21046-1.pdf (last visited Oct. 21, 2013)).  Titan also

notes that the GOC, unlike many other governments, declines to use interest rates to control

inflation for fear of unmanageable capital inflows.  Titan Cmts. 4–5 (citing Pet'r's Cmts. on Loan

Benchmarks (Nov. 9, 2007), PD 145, at 5–6).  Neither observation, however, undermines a

determination that inflation and interest rates are positively correlated in the Chinese economy, at

least to some extent, or that lenders and borrowers are subject to the impact of inflation, albeit

possibly suppressed inflation.  As Titan failed to put forward information rendering unreasonable

Commerce's conclusion that inflation and interest rates are correlated in the Chinese economy,

the court rejects Titan's challenge and holds that Commerce complied with the court's order.

See Titan Cmts. 5.  Furthermore, because the meaning of an "effective rate" within the

regulations is ambiguous, Commerce was permitted to interpret it in any reasonable manner.

Commerce's decision to use a real interest rate as the "effective rate" is a reasonable

interpretation of this regulation.  Additionally, any argument by Titan in this regard was waived

when Titan failed to challenge the interpretation in its comments before the court.

         Titan also challenges Commerce's rejection of the alternative calculation Titan

proposed during the remand proceeding and in earlier briefing.  Titan Cmts. 6–7.  Titan asserts as

its primary position that no inflation adjustment should be applied because such an adjustment

understates the interest rates paid by Chinese borrowers and because inflation differentials within

the benchmark basket of nominal interest rates are averaged out by virtue of their aggregation.

Id. at 6.  Commerce determined on remand that Titan's proposal would distort the benefit

calculation by failing to account for the extent to which inflation affects domestic interest rates in

the PRC.  See Remand Results at 35.  Titan does not substantively argue in its brief for its earlier

proposal that the GDP deflator be used as a substitute for Commerce's chosen inflation

adjustment, arguing instead that no adjustment should be used.  See Titan Cmts. at 6; Remand

Results at 35–36, 48–50.  The court accordingly does not reach Commerce's rejection of this

alternative, although it notes that this appears to be a choice between two acceptable measures,

each with its own flaws, and Commerce retains discretion in selecting between them.  Titan also

does not justify why the lack of any adjustment is not equally distortive.  Although Commerce

does not always adjust benchmarks to fully reflect economic factors in China, the court is not

persuaded that Commerce's decision to do so here is unreasonable.  As Defendant acknowledged

at oral argument, various imperfect methods exist to calculate a benchmark rate, and

Commerce's choice here seems a reasonable attempt at arriving at a difficult determination.

Therefore, Commerce's choice between its chosen adjustment and no adjustment at all is a

reasonable exercise of its discretion under the statute, and the court sustains it.

**IV.    TUTRIC's Debt Forgiveness**

TUTRIC challenges Commerce's determination that TUTRIC's submissions

failed to provide information sufficient to overcome the inference that TUTRIC's unpaid debt

obligations were forgiven pursuant to governmental action.  TUTRIC Cmts. 10–19.  Defendant

argues that Commerce's determination is supported by substantial evidence and is in accordance

with law.  Def. Cmts. 23–28.  The court sustains Commerce's determination.

When Commerce determines that necessary information is not available on the

record, it may use facts otherwise available to reach a determination.  19 U.S.C. § 1677e(a).  If an

interested party has failed to cooperate in providing valid data upon which Commerce can

calculate trade remedy duty rates, Commerce may calculate a rate using inferences that are

"adverse to the interests of that party in selecting from among the facts otherwise available."  19

U.S.C. § 1677e(b).  In so doing, Commerce may rely on information derived from the petition, a

final determination in the investigation, any previous review, or any other information placed on

the record.  Id.  Even when applying adverse facts available ("AFA"), the resulting rate "must be

'a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase

intended as a deterrent to non-compliance.'"  Gallant Ocean (Thail.) Co. v. United States, 602

F.3d 1319, 1323 (Fed. Cir. 2010) (quoting F.lli de Cecco Di Filippo Fara S. Martino S.p.A. v.

United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

Typically, Commerce cannot rely on an unaffiliated party's failure to cooperate to

justify the application of an AFA rate unless the exporter under investigation also is found

responsible for the behavior in some way.  See 19 U.S.C. § 1677e(b) (noting that Commerce

must determine that a party did not act "to the best of its ability"); see also Nippon Steel Corp. v.

United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (requiring Commerce to examine

respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation

before applying adverse inferences); Tianjin Magnesium Int'l Co. v. United States, Slip Op. 11-

17, 2011 Ct. Int'l Trade LEXIS 16, at *5–10 (Feb. 11, 2011) (rejecting the application of an AFA

rate based on the actions of another party); SKF USA Inc. v. United States, 675 F. Supp. 2d

1264, 1275–77 (CIT 2009) (finding unlawful the application of an AFA rate to a cooperative

respondent in order to encourage the compliance of an unaffiliated supplier).[13]

 The court has recognized that in the CVD context, often the government, rather

than the respondent in the investigation, possesses the information needed by Commerce to

evaluate accurately the alleged subsidies.  See, e.g., Fine Furniture (Shanghai) Ltd. v. United

States, 865 F. Supp. 2d 1254, 1260–62 (CIT 2012).  When Commerce has access to information

on the record to fill in the gaps created by a lack of cooperation by the government, however, it is

expected to consider such evidence.  Id. at 1262.  If an alternative benchmark meets the

regulatory criteria and is neutral with respect to a cooperating party, that benchmark would be

superior to the one that adversely affects the cooperating party.  Id. at 1262 & n.10.

 In the present matter, Commerce sought in its initial investigation information

from the GOC concerning the transfer of TUTRIC debt holdings from Bank of China ("BOC") to

---

[13] To the extent that Mueller Comercial de Mexico v. United States, 887 F. Supp. 2d 1360 (CIT 2012), can be read to allow a cooperator's rate in an AD case to be based on the non-cooperation of another party, the court rejects it.

China Cinda Asset Management Co., Ltd. ("Cinda"), a GOC-owned asset management company, and then to Avenue Capital Group ("Avenue Asia"), a U.S.-based investment firm.  <u>I & D Memo</u> at 116.  Commerce explained that this information was material to its investigation because the transfer agreements could contain provisions forgiving portions of TUTRIC's debt or limiting in some way the purchaser's ability to collect.  <u>Id.</u>  The GOC refused to release any information, claiming that the information was proprietary and that the companies involved in the transaction did not consent to its release.  <u>Id.</u>  Although the GOC acknowledged that it held controlling interests in the banks and debt servicer, it claimed that it had a policy of not intervening in the operations of the companies.  <u>Id.</u>  Thus, Commerce applied AFA directly against the GOC and indirectly against TUTRIC in relation to this debt forgiveness.  <u>Id.</u>  No party argued that TUTRIC had access to these third-party agreements during the investigation,[14] and it was undisputed that TUTRIC partially settled its outstanding debt with Avenue Asia and, as requested, produced documents confirming this agreement.[15]  Br. in Supp. of Pl. Tiajin United Tire & Rubber Int'l Co., Ltd.'s Rule 56.2 Mot. for J. upon the Agency R. ("TUTRIC Mot.") 16.

In its previous decision, the court instructed Commerce to consider TUTRIC's submission of the BOC-Cinda transfer agreement, which Commerce had previously rejected, if the agreement appeared reliable and its consideration mitigated the collateral effects of the

---

[14] The <u>Remand Results</u> assert that TUTRIC conceded on remand that it had the Cinda-Avenue Asia agreement but did not provide it.  <u>Remand Results</u> at 45.  Both TUTRIC and the Defendant have recognized that this concession was based on a misreading of a document submitted by TUTRIC, but not authored by it.  <u>See</u> Def. Cmts. 28; TUTRIC Cmts. 17. Defendant does not claim that this can serve as a basis for AFA.

[15] No documents on the record explain how the amount of forgiveness eventually provided to TUTRIC was determined, except that it was ultimately embodied in a settlement agreement.

adverse inference taken against the GOC.  GPX VII, 893 F. Supp. 2d at 1333.[16]  TUTRIC also

provided during the remand proceeding a second submission of what appeared to Commerce to

be affidavits from a TUTRIC official and a Cinda official attesting to the value of the debt

transferred from Cinda to Avenue Asia.  Remand Results at 29.  Commerce determined that a

clause in the BOC-Cinda agreement indicates that associated agreements limiting collection

rights may exist.  Remand Results at 28–29.  Commerce also determined that the second

submission failed to demonstrate that associated agreements did not attach to the Cinda-Avenue

Asia transfer.  Remand Results at 29–30.  TUTRIC contests both findings.  TUTRIC Cmts.

10–19.

TUTRIC first argues that Commerce failed to consider reasonably the language in

the BOC-Cinda agreement transferring any associated agreements to Cinda.[17]  TUTRIC Cmts.

10–13.  TUTRIC contends that this language is boilerplate, noting the generalized quality of the

---

[16] Defendant does not assert that TUTRIC may be held to account for the GOC's noncooperation as a part of the the GOC.  TUTRIC has been held to be an independent entity. See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China; Preliminary Determination of Sales at Less than Fair Value and Postponement of Final Determination, 73 Fed. Reg. 9278, 9284, 9286 (Dep't Commerce Feb. 20, 2008).

[17] The agreement states:

[[




]]

TUTRIC's Resp. to Commerce's Jan. 11, 2013, Req. For Info. at Ex. R-1, CD 1 at bar code 3115117-01 (Jan. 16, 2013), ECF No. 416 (Aug. 1, 2013) ("TUTRIC Jan. 11 Resp.").

*Confidential Information Deleted*

language,[18] the size of the transaction, and certain characteristics of the document.[19]  Id.

Although the court agrees that the language may be boilerplate, it declines to take the additional

step of finding Commerce's consideration of the language unreasonable.  Any associated

agreement, in fact, was transferred to Cinda under the transfer agreement, and the use of

boilerplate language does not suggest that an associated agreement does not exist.  This

conclusion is further supported by the brevity of the document and the undisputed fact that a

portion of the debt ultimately was forgiven.  The language, therefore,  provides some evidence to

support the inference that such an agreement could exist based on facts available.

       TUTRIC further argues, however, that additional considerations demonstrate that

no such agreement exists.  Specifically, TUTRIC argues that the language at issue indicates that

any associated agreement would be in its possession, that it affirmed to Commerce that it

disclosed all relevant information in its possession, and that Commerce failed to find at

verification any evidence to the contrary.  TUTRIC Cmts. 14–15.  This argument also is

unavailing.  First, although the language implies TUTRIC's possession of any agreement to

---

[18] TUTRIC argues that the word [[        ]] in the phrase [[                              ]]
is indefinite and ambiguous, suggesting only that such an agreement may exist.  TUTRIC Cmts.
11.  TUTRIC also argues that the word [[     ]] in the [[                                    ]]
demonstrates that any associated agreement, if one does exist, does not necessarily concern
[[                ]].  Id.

[19] TUTRIC cites [[                                           ]], including the
following: [[

]] TUTRIC Cmts. 12–13. TUTRIC also points to the Chinese-language document, which
includes [[

                                    ]] Id. at 13.

*Confidential Information Deleted*

which it is a party,[20] the set of agreements about which Commerce is concerned is not limited to those identified in the transfer agreement.  Remand Results at 46–47.  Second, although Commerce has an obligation to consider neutral evidence when making inferences to fill in record gaps, as TUTRIC was a cooperating party, Commerce is not obliged to fill the gaps proactively as part of its verification procedures.  See Max Fortune Indus. Co. v. United States, Slip Op. 13-52, 2013 Ct. Intl. Trade LEXIS 57, at *11 (Apr. 15, 2013) ("The purpose of verification is to 'verify the accuracy and completeness of submitted factual information.'" (quoting 19 C.F.R. § 351.307(d) (2012))); see also Chia Far Indus. Factory Co., Ltd. v. United States, 28 CIT 1336, 1344, 343 F. Supp. 2d 1344, 1354 (2004) ("The statute and regulation require Commerce to verify information but generally leave the scope of verification and the procedures for conducting it to Commerce's discretion.").  TUTRIC also argues that its second submission providing the statements of a TUTRIC official and a Cinda official regarding the value of the holdings transferred from Cinda to Avenue Asia establishes that Avenue Asia received the full value of creditor's rights originating from the BOC-issued debt.  TUTRIC Cmts. 16–18.  This evidence, however, speaks only to the nominal value of the debt and does not speak to the possible existence of associated agreements limiting collection rights.  Remand Results at 29; Def. Cmts. 26–27.

TUTRIC argues generally that Commerce has put it in the impossible position of proving a negative.  TUTRIC Cmts. 15–16.  Although the court is not without considerable

---

[20] TUTRIC cites the phrase [[
           ]]  TUTRIC Cmts. 14.

*Confidential Information Deleted*

concern for the collateral effects of adverse inferences due to government non-cooperation, the

evidence submitted by TUTRIC during the remand proceeding fails to address directly the

possibility of ancillary agreements.  Such evidence would come directly form the non-

cooperating GOC.  The record includes uncontested evidence of debt forgiveness as well as

transfer agreements that reference possible ancillary agreements concerning debt collection.

Additionally, there is no direct evidence that the debt forgiveness originated with Avenue Asia,

as no record evidence discusses the reasons for the particular amount of debt forgiveness

embodied in the settlement agreement.

      Here, Commerce was confronted with analyzing the transfer and eventual

settlement of loans that never were considered fully-collectible commercial debt, at least by the

time of the transfer from the BOC to Cinda.  The history of these loans, with no regular

payments, repeated renegotiations, inexplicable interest waivers, and no serious efforts to

minimize the lender's loss, indicate that the loans were not treated by the BOC as ordinary

commercial debt.  See Final Calculation Memorandum for Tianjin United Tire & Rubber

International Co., Ltd. at 5–8, CD 591 (July 7, 2008).  Only when the loans were transferred to an

external entity, Avenue Asia, did they take on any commercial indicia and appear as something

more than government equity infusions.  Relying on the amount forgiven (as now conservatively

calculated by Commerce) seems a particularly fair way to value the subsidy.  Had the whole

"loan" amounts been seen as equity infusions from the outset or at one of the earlier debt

forgiveness stages, no doubt the rate of subsidization would be greater.  Instead, Commerce

decided to approach the convoluted history of these renegotiated loans by treating them as debt

forgiveness at the time they were transferred by the last GOC entity holding them to Avenue

Asia.[21]  When taken as a whole, the evidence on the record provided sufficient support for

Commerce's determination that governmental subsidization occurred in the amount now

established based on facts otherwise available, without the need for drawing an adverse inference

against TUTRIC.  See 19 U.S.C. § 1677e(a) ("If . . . necessary information is not available on the

record . . . [Commerce] shall . . . use the facts otherwise available in reaching the applicable

determination . . . .").  Accordingly, the court sustains Commerce's determination on this basis.


## CONCLUSION

For the foregoing reasons, the determination of Commerce is SUSTAINED.

Judgment will be entered accordingly.


                                           /s/ Jane A. Restani
                                          Jane A. Restani
                                              Judge


Dated: October 30, 2013
          New York, New York


---

[21] The loans were bundled and sold as part of a "bad debt sale initiative" along with RMB
21.5 billion in other "non-performing loans" covering 1,500 debtors.  See TUTRIC Mot. 5;
TUTRIC Supp. Questionnaire Resp., Ex. SCVD-11 at 2, CD 200 (Nov. 27, 2007).  TUTRIC
agreed at oral argument that the loans were sold for below the face value of the debt.  Although it
is one more fact missing from the record, given the state of the debt, one may infer that the
discount was steep.